IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Trina Shantae Marshall,** <br><br> Plaintiff, <br><br> v. <br><br> **Carolyn L. Colvin,** <br>**Acting Commissioner of Social Security,** <br><br> Defendant. | CASE NO. 16cv666 BAS (PCL) <br><br> **REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE:** <br><br> **GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 13); and** <br><br> **DENYING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT (Doc. 22.)** |

## I.<br>INTRODUCTION

Plaintiff seeks judicial review of Acting Commissioner of Social Security's final decision denying Plaintiff's application for disability insurance benefits. (Doc. 1.) Plaintiff filed a Motion for Summary Judgment (Doc. 13), and Defendant filed a Cross-Motion for Summary Judgment (Doc. 22). The Honorable Cynthia Bashant referred the matter to undersigned judge for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). After a thorough review of all pleadings and the entire record submitted in this matter, this Court recommends that Plaintiff's Motion for Summary Judgment be **GRANTED** and that Defendant's Cross-Motion for Summary Judgment be **DENIED**.

## II.

## BACKGROUND

Plaintiff Trina Shantae Marshall filed an application for Disability Insurance Benefits and Supplemental Security Income on September 24, 2012, alleging an inability to work beginning February 7, 2011 due to migraine headaches, fibromyalgia, and chronic pain syndrome. (Doc. 1, at 1-3.) The claim was initially denied on December 17, 2014, and upon reconsideration on January 20, 2016. (Doc. 1, at 2.) On September 26, 2014, the claimant appeared and testified at a hearing before ALJ Peter Valentino, in which Connie Guillory, a vocational expert, testified. (A.R. 23-32.)

In his decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since February 7, 2011.

2. The claimant has the following severe impairments: migraine headaches, fibromyalgia, and chronic pain syndrome.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. The claimant has the residual functional capacity to perform light work, except lift and carry 20 pounds occasionally, 10 pounds frequently, sit for six hours in an eight-hour workday and stand/walk for six hours in an eight-hour workday, with normal 10-minute breaks and restricted fine manipulation and upper extremity reaching limited to occasionally in an eight-hour workday.

5. The claimant is unable to perform past relevant work.

6. The claimant was born on July 15, 1979, which is defined as a younger individual.

7. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

8. The claimant has not been under a disability as defined in the Social Security Act from February 7, 2011 through the date of the decision.

(A.R. 23-32.)

Plaintiff appealed, but the Appeals Council issued an unfavorable decision,

making the ALJ's December 2014 decision the final determination of the Commissioner of Social Security for purposes of judicial review. Plaintiff then filed this action on March 18, 2016. (Doc. 1.) Defendant answered on May 31, 2016. (Doc. 13.) Plaintiff filed a Motion for Summary Judgment (Doc. 13), and Defendant filed a Cross-Motion for Summary Judgment in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 22).

This Report and Recommendation addresses both motions pending before this Court.

## III.
## ADMINISTRATIVE RECORD

Plaintiff was 31 years old as of the alleged onset date. (A.R. 41, 160.) She worked as a customer service representative until February of 2011. (A.R. 41-42.) She stopped working due to multiple absences stemming from migraines and chronic pain. (A.R. 42.)

A. Treatment Record

1. Dr. Richard Butcher, M.D.

Plaintiff visited internal medicine doctor Richard Butcher for a check-up on November 6, 2012. (A.R. 284-86.) She complained of numbness and tingling of hands, migraines, and anxiety, and requested medication for carpal tunnel symptoms. (A.R. 284-85.) The doctor observed that Plaintiff "ambulates to the examination room without assistance" and "is able to sit comfortably on the examination table without difficulty or evidence of pain." (A.R. 285.) He diagnosed her with common migraines, carpal tunnel syndrome, dysthymic disorder (depression), menstrual disorder, and herpes simplex virus. (A.R. 285.) Although he did not see Plaintiff, Dr. Butcher refilled her medications and added Prozac per her psychologist's prescription on December 14, 2012 and again on December 26, 2012. (A.R. 376-79.)

On February 5, 2013, Plaintiff returned to Dr. Butcher for a routine checkup.

(A.R. 373.) She reported that her neurologist had requested that she be evaluated for fibromyalgia, and that her psychologist wanted Dr. Butcher to prescribe the antidepressant Cymbalta. (A.R. 373.) By April of 2013, she reported to be in "severe pain" but Dr. Butcher recorded that Plaintiff was in "mild pain." (A.R. 370.) Dr. Butcher added rheumatism not otherwise specified to her diagnosis and reiterated her need for a rheumatology evaluation. (A.R. 371.) Dr. Butcher also said he would follow up with Dr. Chapman regarding Plaintiff's fibromyalgia. (A.R. 371.)

2. Dr. William T. Chapman, M.D.

Plaintiff sought treatment from neurologist William T. Chapman, M.D., for migraines since 2003. (A.R. 259-65, 398-412.) In July 2010, Dr. Chapman performed a neurological examination, which yielded normal findings. (A.R. 262.) The following month Plaintiff brought "disability forms" for Dr. Chapman to complete. (A.R. 263.) She reported feeling stressed and anxious. (A.R. 263.) Again a neurological exam yielded normal results, and she received Topamax and Vicodin for pain relief. (A.R. 263.) A return visit in September 2010 again showed no neurological abnormalities. (A.R. 264.) The record indicates that Plaintiff did not visit Dr. Chapman again until more than two years later, in December 2012. (A.R. 265.) Conducting objective testing on December 13, 2012, Dr. Chapman noted a positive Tinel's sign on the right and diagnosed her with carpal tunnel syndrome. (A.R. 412.)

Plaintiff underwent a nerve conduction study in January 2013. (A.R. 406.) The results were normal, with no evidence of radiculopathy or neuropathy. (A.R. 406.) However, an MRI of the brain "revealed an empty sella." (A.R. 404.) The MRI specialist described the finding as follows: "Partially empty sella turcica/compressed pituitary gland, although commonly seen in older patients, is atypical in a patient of this age, and has been described as a radiologic marker of pseudotumor cerebril/benign intracranial hypertension." (A.R. 465.)

Plaintiff continued to complain of pain, numbness, tingling, and burning. (A.R. 404.) She reported feeling depressed and having trouble sleeping and eating. (A.R. 404.) However, as in prior and subsequent visits, Dr. Chapman found that Plaintiff was alert and orientated, her language and attention span were normal, and her memory was intact. (A.R. 399, 401, 403, 404-05, 410, 412.) Dr. Chapman found that she had normal muscle tone, bulk and strength, that she had normal reflexes and gait, that her sensory examination was intact to pin, position and vibration, and that there was neither finger to nose ataxia nor Babinski sign. (A.R. 399, 401, 403, 404-05, 410, 412.) Dr. Chapman diagnosed extremity pain and numbness, increased Plaintiff's dose of Gabapentin (generic for Neurontin), and referred her to a rheumatologist. (A.R. 357, 359, 405, 410.) On March 14, 2013, Dr. Chapman suspected that Plaintiff may have fibromyalgia. (A.R. 358-59.)

In August 2013, Plaintiff returned to Dr. Chapman's office complaining of pain and stated the Gabapentin was not helping. (A.R. 400.) She told Dr. Chapman that she had retained an attorney to assist with her disability application. (A.R. 400.) All objective testing yielded normal results. (A.R. 401.) Dr. Chapman diagnosed fibromyalgia, numbness, and extremity pain. (A.R. 401.) In a February 2014 examination, physical and mental status exams were normal except for the positive Tinel's sign on the right side, for which Dr. Chapman justified his carpal tunnel syndrome diagnosis. (A.R. 399.) Plaintiff consistently reported to Dr. Chapman that she smoked cigarettes daily but denied drug use. (A.R. 398, 400, 402, 404, 409, 411.)

Dr. Chapman referred Plaintiff to a pain clinic, where she received Botox injections for her migraines. (A.R. 472-475.) Although she reported that medication improved her symptoms, Plaintiff stated that she did not "wish to try any more medication" and was receptive only to Botox treatments. (A.R. 468, 474-75.) In May 2014, she reported her pain as a 10/10, yet she stated that medication improved her symptoms and the pain did not prevent her from performing normal

daily activities such as bathing, dressing, and getting up from the bed or chair. (A.R. 468-472, 474.) Plaintiff was advised to pursue physical therapy for her low back pain. (A.R. 475.)

In June of 2014, Dr. Chapman completed an "Impairment Questionnaire" drafted by Plaintiff's attorney. (A.R. 394-96.) He wrote diagnoses of fibromyalgia, chronic pain syndrome, and migraines. (A.R. 394.) Dr. Chapman opined that Plaintiff could sit, stand, or walk for less than one hour each during an eight-hour workday; she must get up from a seated position every 15 minutes and required 15 minutes before she could return to a seated position; she could occasionally lift up to five pounds but carry no weight; and she would likely be absent from work more than three times each month. (A.R. 395-96.)

3. Akther Kotha, M.D.

Plaintiff saw rheumatologist Akther Kotha, M.D., between December 2013 and August 2014. (A.R. 422-46.) Following an appointment in December 2013, during which Plaintiff complained of pain in her neck, back, knees, hands, wrists, and forearms, Dr. Kotha noted that Plaintiff's brain and cervical spine imaging results were normal. (A.R. 443.) The doctor assessed full range of motion and full strength at 5/5 in all extremities, and noted that sensation was grossly intact to light touch throughout. (A.R. 445.) Plaintiff had stopped taking Gabapentin. (A.R. 443.) The only medication she reported taking was baclofen. (A.R. 443.) Imaging of the knees in January 2013 showed no abnormalities. (A.R. 442.) Dr. Kotha diagnosed her with fibromyalgia, prescribed Plaquenil and Topamax, and recommended heat pads, stretches, massages, and acupuncture. (A.R. 440.)

In medical notes dated March 3, 2014, Dr. Kotha wrote that she spoke to Plaintiff "at length" about getting proper exercise. (A.R. 436.) Plaintiff said that Lyrica had helped somewhat. (A.R. 436.) She reported that she stopped taking Topamax because she felt it was not helping. (A.R. 436.) Dr. Kotha administered trigger point injections in her shoulder area, and on a subsequent visit, Plaintiff

reported significant improvement because of both the injection and Lyrica. (A.R. 430.) Plaintiff stated that she was walking 30 minutes a day at this point. (A.R. 430.) She was still smoking marijuana daily. (A.R. 431.) Three months later, Plaintiff contended that Lyrica was not providing relief, and she was now experiencing radiating pain in her left buttock. (A.R. 427.) She had some tenderness but had full range of motion in all peripheral joints. (A.R. 428-29.)

Plaintiff's last appointment with Dr. Kotha was in August 2014. (A.R. 422-24.) On this visit, Plaintiff stated that Lyrica was helping with the numbness and tingling but not with her overall pain. (A.R. 422.) Although she did not experience side effects from the medication, she reported that she did not take it consistently. (A.R. 422.) Plaintiff again reported daily marijuana use. (A.R. 423.) The doctor assessed full range of motion in the peripheral joints but tenderness in the trapezius and diffuse pain in the arms and legs. (A.R. 424.) Dr. Kotha advised Plaintiff to exercise and walk daily. (A.R. 424.)

In August 2014, Dr. Kotha completed a "Fibromyalgia Questionnaire" that was submitted by Plaintiff's attorney. (A.R. 449-453.) She indicated that there were no activities Plaintiff must avoid because of medication side effects, and that Plaintiff could lift and carry up to 10 pounds frequently and 20 pounds occasionally. (A.R. 451-52.) Dr. Kotha assessed no significant limitations in reaching, handling, or fingering, and found she could frequently grasp, turn, and twist objects; occasionally use her hands and fingers for fine manipulation; and occasionally use her arms for reaching, including overhead reaching. (A.R. 452.) Conversely, Dr. Kotha indicated that Plaintiff would frequently experience pain or other symptoms severe enough to interfere with attention and concentration and would likely be absent more than three times a month. (A.R. 453.) She said that Plaintiff would need two or three breaks a day for 15-30 minutes each and could sit, stand, or walk for only two hours. (A.R. 452-53.)

4. Kristin Filizetti, Ph.D.

Plaintiff sought mental health treatment from Kristin Filizetti, Ph.D., for three months, from December 2012 to February 2013. (A.R. 332-336, 386, 417-19.) Dr. Filizetti's notes from appointments in December 2012 indicate that Plaintiff appeared dysphoric, depressed, and tearful at times. (A.R. 332, 335, 419.) She found that Plaintiff seemed to be suffering with "complicated grief" and major depressive disorder. (A.R. 419.) The record indicates that at the beginning of treatment, Plaintiff brought "SSI paperwork" for Dr. Filizetti to complete. (A.R. 419.)

On December 21, 2012, Dr. Filizetti observed that although Plaintiff reported feeling depressed, she was alert and attentive, and she reported improvement in her appetite. (A.R. 419.) Plaintiff reported anxiety and problems sleeping during several visits. (A.R. 417-19.) Dr. Filizetti noted on January 18, 2013 that Plaintiff was anxious and drowsy but that she had "dressed up." (A.R. 418.) On February 12, 2013, she presented as anxious and excited after having ended a relationship that had been challenging for her. (A.R. 417.) Dr. Filizetti relayed in a letter dated June 28, 2013 that Plaintiff scheduled no further assessments after February 2013 and "did not complete any psychological assessments due to the short duration of the treatment." (A.R. 386.)

One year later, on March 5, 2014, Dr. Filizetti completed a "Mental Impairment Questionnaire" created by Plaintiff's attorneys, following an examination two days earlier. (A.R. 388-392.) On the questionnaire, Dr. Filizetti wrote that Plaintiff had dysthymic disorder and generalized anxiety disorder. (A.R. 388.) The doctor completed a checklist form with respect to Plaintiff's limitations and symptoms, opining that Plaintiff had mild to moderate limitations in understanding and memory, concentration and persistence, social interaction and adaption. (A.R. 389, 391.) However, she indicated that Plaintiff had marked limitations in completing a workday without interruptions from psychological

symptoms, and moderate-to-marked limitations in maintaining attention and concentration for extended periods, working near others without distraction, performing at a consistent pace without unreasonably long rest periods, accepting instructions and criticism, and in making plans independently. (A.R. 391.) Finally, she indicated that Plaintiff would be absent two to three times per month due to her mental health symptoms. (A.R. 392.)

B. State Agency Consultants

1. Thomas Sabourin, M.D.

Dr. Thomas Sabourin performed a consultative examination in January 2013. (A.R. 348-52.) Plaintiff complained of pain in her neck, hands, shoulders, hips, wrists, and back. (A.R. 348.) She stated that she had undergone three nerve conduction studies, all of which yielded normal results and showed no evidence of carpal tunnel syndrome. (A.R. 348.) Nonetheless, she stated that she had seen a hand surgeon who opined that she had carpal tunnel syndrome and suggested surgery. (A.R. 348.) Plaintiff conveyed that her neurologist suspected fibromyalgia. (A.R. 348.) Plaintiff stated that she experienced pain with sitting, bending, and lifting, but Dr. Sabourin observed that she sat and stood comfortably and with normal posture, and she had no problems getting on and off the examination table and in and out of the chair. (A.R. 348-49.) The doctor administered a grip strength test, and noted she exhibited "poor effort" on the right side, such that her grip strength was zero in the right hand and 40-44 pounds on the left. (A.R. 349.) Plaintiff showed reduced range of motion in her neck during formal testing, but was "noted to move her neck more during the course of the informal part of the examination." (A.R. 350.) Dr. Sabourin assessed full range of motion and normal strength, sensation, and reflexes. (A.R. 350-51.) He could find no significant limitations from an orthopedic viewpoint. (A.R. 352.)

2. Maria M. Legarda, M.D.

Dr. Legarda reviewed Plaintiff's records in January 2013. (A.R. 80-81.) Dr.

Legarda noted that in the disability report Plaintiff submitted, she wrote that she was limited in "everything" because of her hands, but she later told Dr. Sabourin that she had a history of pain in her entire body. (A.R. 81; compare to A.R. 174.) The doctor noted that physical, neurological, and musculoskeletal exams were all normal, including free neck movement during the informal part of her exam. (A.R. 81.) Dr. Legarda found that Plaintiff did not have a medically determinable impairment of carpal tunnel syndrome and that her migraine impairment was non-severe. (A.R. 81.) Upon reconsideration, S. Lee, M.D. affirmed Dr. Legarda's assessment. (A.R. 93.)

3. Soliman Mounir, M.D.

Plaintiff underwent a consultative examination with Board-certified psychiatrist Soliman Mounir, M.D., on January 17, 2013. (A.R. 339-44.) Dr. Mounir noted that Plaintiff had driven to the appointment and appeared pleasant, cooperative, and groomed, with a normal gait and posture. (A.R. 339.) Plaintiff's primary complaint was depression, which she said began in 2002. (A.R. 339.) She reported sadness, lack of energy and concentration, hopelessness, and helplessness. (A.R. 340.) She endorsed no psychotic symptoms. (A.R. 340.) She relayed that she smoked marijuana and had been arrested for domestic violence. (A.R. 341.) Plaintiff told Dr. Mounir that she was able to cook, clean, shop, run errands, take care of personal hygiene, and take care of financial responsibilities and her daily activities. (A.R. 341.) Plaintiff further conveyed that she got along well with family, friends, and neighbors. (A.R. 341.)

Dr. Mounir noted that Plaintiff's speech was soft, with decreased rate and rhythm, but she was coherent, made good eye contact, was alert and orientated, and exhibited intact immediate, recent, and remote memory. (A.R. 341.) Upon psychological testing, Plaintiff had good memory and mental function and exhibited normal abstract thinking and good insight. (A.R. 341-42.) Dr. Mounir determined that Plaintiff could understand, carry out, and remember simple and

complex instructions; she could interact appropriately with coworkers, supervisors, and the public; and she could withstand the stress of workday activities. (A.R. 343.)

In January 2013, state agency psychiatrist K.L. Loomis, DO, agreed with Dr. Mounir's assessment, finding that Plaintiff's mental impairment was non-severe. (A.R. 80-82.) State agency psychologist Randall J. Garland, Ph.D., affirmed Dr. Loomis' assessment upon reconsideration. (A.R. 93-94.)

C. Plaintiff's Testimony and Statements

In her disability application, dated September 24, 2012, Plaintiff listed her impairments as carpal tunnel syndrome, depression, migraine headaches, and anxiety. (A.R. 174.) Although she stopped working on February 7, 2011, she alleged that her condition became severe enough to prevent her from working on June 15, 2010. (A.R. 174.) Plaintiff reported taking Cymbalta, Depakote, and ibuprofen. (A.R. 176.) She wrote that treatment for her carpal tunnel syndrome consisted of examinations, physical therapy, and nerve conduction studies. (A.R. 178.)

In a function report two months later, Plaintiff noted problems with appetite and sleep. (A.R. 187.) She wrote that the numbness and tingling in her hands prevented her from combing her hair, holding her granddaughter, or using a telephone, although she babysat her granddaughter while her daughter was at work, cooked, dusted, vacuumed, did laundry, and walked, fed, and care for her dog. (A.R. 188-89.) Plaintiff described mind-racing and anxiety attacks, and wrote that she did not leave the house often, but she did walk and drive by herself when she could. (A.R. 188-190.) Her reported hobbies included reading, cooking, and playing with her dog and granddaughter. (A.R. 191.) She could walk a mile and could follow instructions well, although sometimes she needed them to be repeated. (A.R. 192.)

Plaintiff testified during a hearing on September 26, 2014, confirming that she

lost her job because of multiple absences. (A.R. 40-73.) Plaintiff testified that she tries to walk for exercise based on Dr. Kotha's recommendations, but sometimes she is unable to because of her pain, and she stopped walking her dog one year ago. (A.R. 45.) She also stopped grocery shopping about six months ago. (A.R. 46.) Plaintiff testified that she was unable to hold her grandchildren because she would "almost drop them," but she stated she could carry them for short periods of time. (A.R. 59-60.) She estimated they weighed about 13 or 14 pounds. (A.R. 60.)

Plaintiff conceded that she stopped taking her prescribed medications because she became frustrated and told Dr. Chapman that she was "tired of just the band-aids," and she had been off her migraine medication since 2011 despite her physicians' recommendations. (A.R. 52-53.) When the ALJ questioned Plaintiff about her marijuana use, she responded that she smoked weekly, not daily as in her previous statements, and she obtained the drugs from a friend. (A.R. 44, 423, 431.)

### D. Vocational Expert's Testimony

A vocational expert (VE) also testified at the hearing. (A.R. 61-65.) The ALJ asked whether a hypothetical individual could perform Plaintiff's past relevant work if the individual: had Plaintiff's background; had combined impairments of fibromyalgia, fatigue, and pain; was limited to lifting/carrying 10 to 20 pounds only occasionally; must avoid continuous sitting in an eight-hour day by moving around hourly for 10 minutes each hour; and was limited to occasional fine manipulation and reaching. (A.R. 62-63.) The VE responded that the individual would not be able to perform Plaintiff's past work. (A.R. 63.) The ALJ then clarified that the total amount of standing, walking, or sitting would be six hours out of an eight-hour day. (A.R. 63.) The VE stated the individual could not do Plaintiff's past work, but could perform some unskilled light duty occupations. (A.R. 63.) The VE identified three potential occupations found in the Dictionary of Occupational Titles (DOT), all of which have a specific vocational profile (SVP) of two: ticket taker, information clerk, and recreation aide. However, the individual

would not be able to perform these occupations if she had to miss work three or more times a month, required two to three breaks for 15 to 30 minutes at a time in addition to regular breaks, or was limited to only two hours of standing. (A.R. 64-65.)

## IV.

## ALJ's Decsion

The ALJ found that Plaintiff was not disabled after following the five-step sequential evaluation set forth in 20 C.F.R. § 404.1520(a)(4). (A.R. 22-32.) The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability. (A.R. 24.) The ALJ determined that Plaintiff's migraine headaches, fibromyalgia, and chronic pain syndrome were severe impairments, but that she did not have a presumptively disabling impairment or combination of impairments that met or medically equaled the Listing of Impairments. (A.R. 24-26.) The ALJ then concluded that Plaintiff retained the residual functional capacity to perform light work, except that she could lift and carry only 20 pounds occasionally and 10 pounds frequently, she could sit, stand, and walk for six hours in an eight-hour workday with normal ten-minute breaks, and she could perform fine manipulation and upper extremity reaching occasionally. (A.R. 26.) In making this finding, the ALJ discounted the opinions of the following treatment physicians: Dr. Kristin Filizetti, Dr. Akther Kotha, and Dr. William T. Chapman. (A.R. 26-29.) With regard to Dr. Kristin Filizetti, the ALJ found that "there were no mental status examinations or narrative explanations involving any detailed assessment of the claimant's mental condition in the treatment records from Dr. Filizetti, which primarily reflect the claimant's subjective complaints." (A.R. 26.) With regard to Dr. Kotha, the ALJ found that work-place restrictions that he would place on Plaintiff were "not supported by his own treatment records that showed that the claimant reported improvement in symptoms with trigger point injections which helped dull pain." (A.R. 27.) With

regard to Dr. Chapman, the ALJ found that "the extreme physical limitations set forth by Dr. Chapman are not supported by the evidence of record," which did not have objective medical evidence showing "pathology reasonably likely to produce the debilitating symptoms alleged." (A.R. 29.) The ALJ also discounted the treating physicians' opinion by noting the discrepancies in Plaintiff's subjective complaints and in her actual activities, which included the ability to walk for a mile at a time, to cook, clean, shop, run errands, and maintain these daily activities on a routine basis. (A.R. 29.) The ALJ also cited to the state agency physicians' opinions, which "determined that the medical evidence shows that although the claimant's condition results in some limitations, the claimant remains capable of performing full-time work activity on a sustained basis." (A.R. 28.) Although the ALJ found Plaintiff was not capable of performing her past relevant work, he determined that she was not disabled because she could perform other jobs that existed in significant numbers in the national economy. (A.R. 31-32.)

## V.

## STANDARD OF REVIEW

    To qualify for disability benefits under the Social Security Act, an applicant must show that: (1) she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that she previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C.A. § 423 (d)(1)(A), (2)(A) (West 2004). An applicant must meet both requirements to be "disabled" and entitled to benefits. Id.

### A. Sequential Evaluation of Impairments

    The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are as follows: (1) Whether the claimant is presently working in any substantial gainful activity. If so, the claimant

is not disabled. If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the claimant is disabled. If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work she has done in the past. If so, the claimant is not disabled. If not, the evaluation proceeds to step five. (5) Whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 CFR § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

### B. Judicial Review

Sections 206(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C.A. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless: (1) the ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Vasquez v. Astrue, 547 F.3d 1101, 1104 (9th Cir. 2008) (quoting Andrews, 53 F.3d at 1039). Where the evidence is susceptible to more than one

rational interpretation, the ALJ's decision must be affirmed. Id. (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g). This matter may also be remanded to the Social Security Administration for further proceedings. Id. Furthermore, "[a] decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

## VI.

## DISCUSSION

Plaintiff first argues that the ALJ committed legal error in granting no weight to the mental function assessments of treating psychologist Dr. Filizetti. (Doc. 13-1, at 5.) Plaintiff then argues that the ALJ committed legal error in granting little or no weight to the physical function assessments of treating neurologist Dr. Chapman and treating rheumatologist Dr. Kotha. (Doc. 13-1, at 5.) Finally, Plaintiff argues that the ALJ failed to provide clear and convincing reasons for finding Plaintiff's subjective complaints not credible. (Doc. 13-1, at 5.) Applying the *Cotton* test set out in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986), the Court finds that the ALJ committed legal error in completely ignoring Plaintiff's MRI scan showing a partially empty sella in her brain, which may be an objective marker of her pain, without giving specific, legitimate reasons for doing so.

"In deciding whether to accept a claimant's subjective symptom testimony, an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms." Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996). "Under the *Cotton* test, a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged...'" Id. (citations omitted).

Once the *Cotton* test is met and "there is no affirmative evidence suggesting she is malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so. The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." Id. at 1283-84 (citations omitted).

Here, the ALJ ignored the objective medical evidence revealed in an MRI scan of Plaintiff's brain showing a partially empty sella and compressed pituitary gland, which according to the medical records is a radiologic marker of intracranial hypertension. (A.R. 465.) Plaintiff submitted evidence that such a marker could explain her migraines and fatigue and other symptoms that she has been experiencing. (Doc. 13-1, at 5; https://medlineplus.gov/ency/article/000349.htm.) Although her treating physicians did not explicitly focus on this marker as a root of her symptoms, Dr. Chapman did point out this curious finding in his summary of the findings of the MRI specialist. Although Dr. Chapman was not clear if he believed that this empty sella was a marker that could explain Plaintiff's migraines and pain symptoms, one must assume that Dr. Chapman based his assessment of Plaintiff's inability to work on his entire treatment record of her over the course of ten plus years that he treated her. What's more, Dr. Chapman's assessment of Plaintiff's disabling pain was backed up by Plaintiff's psychiatrist Dr. Filizetti and her rheumatologist Dr. Kotha. The only doctors who did not agree with Plaintiff's treating physicians assessments of Plaintiff's disabling pain were the state agency consultants who did not address Plaintiff's partially empty sella. As Plaintiff has produced objective medical evidence of a potential underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged, the ALJ was obligated to do the following: 1) develop the record by asking the state agency consultants whether Plaintiff's partially empty sella was in any way significant to Plaintiff's overall condition; and 2) analyze all of Plaintiff's

testimony regarding the severity of her symptoms by making specific findings supported by clear and convincing reasons. The ALJ has not done this type of analysis in his December 17, 2014 disability decision. Thus, because the ALJ erred, this Court recommends remanding the case to the ALJ for further review and analysis using the proper legal frameworks of analysis.

## VII.

## CONCLUSION

For the aforementioned reasons, the Court recommends granting Plaintiff's motion for summary judgment, denying Defendant's summary judgment motion, and remanding the case to the ALJ.

This Report and Recommendation is submitted to the Honorable Cynthia Bashant, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **March 10, 2017**. The document should be captioned "Objections to Report and Recommendation."  Any reply to the Objections shall be served and filed on or before **March 20, 2017**. The parties are advised that failure to file objections within the specific time may waive the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATE:  February 23, 2017

Peter C. Lewis
U.S. Magistrate Judge
United States District Court