# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

TRINA SHANTAE MARSHALL,

Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

Defendant.

Case No. 16-cv-00666-BAS-PCL

**OPINION AND ORDER**

Plaintiff Trina Marshall seeks judicial review of a final decision by the Acting Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–433 (2012). For the reasons that follow, the Court grants in part Plaintiff's motion for summary judgment (ECF No. 13), denies the Commissioner's cross-motion for summary judgment (ECF No. 22), and declines to adopt the report and recommendation (ECF No. 26). The matter will be remanded to the ALJ for further proceedings.

## BACKGROUND

Marshall alleges she became disabled on February 7, 2011, at which time she

was 31 years old. Prior to the onset of disability, Marshall worked as a customer service representative. (ECF No. 8, Administrative Record ("AR") 41–42.) She stopped working after being terminated due to multiple absences stemming from migraines and chronic pain. (AR 42.) Marshall lives with her stepfather, brother, two daughters, and three grandchildren. (AR 41.)

Marshall suffers from migraines, depression, chronic pain syndrome, and fibromyalgia. (AR 24.) Her treatment has included physical therapy, a variety of prescription pain medications, Botox injections to alleviate pain from her migraines, and targeted cortical steroid injections (known as "trigger point" injections) to alleviate pain associated with her fibromyalgia. Marshall testified at the administrative hearing that she has occasionally experienced improvement from treatment, but that her pain has persisted overall, especially as it relates to her fibromyalgia.

On September 24, 2012, Marshall filed an application for disability insurance benefits under Title II of the Social Security Act. (AR 160–61.) The application was denied on initial administrative review and on reconsideration, after which Marshall requested her claim be heard before an administrative law judge ("ALJ"). (*See* AR 83, 95, 110–16.) A hearing was held before ALJ Peter Valentino on September 26, 2014. In a decision dated December 17, 2014, the ALJ determined that Marshall was not disabled under the meaning of the Social Security Act. (AR 22–32.) Marshall's request for review was denied by the Appeals Council, making the ALJ's decision the final decision of the Commissioner. Marshall now seeks judicial review. (ECF No. 1.)

## LEGAL STANDARD

Under 42 U.S.C. § 405(g), an applicant for social security disability benefits may seek judicial review of a final decision of the Commissioner in federal district court. "As with other agency decisions, federal court review of social security determinations is limited." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090,

1098 (9th Cir. 2014). Federal courts will uphold the Commissioner's disability determination "unless it contains legal error or is not supported by substantial evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006)).

"'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). In reviewing whether the Commissioner's decision is supported by substantial evidence, the court must consider the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.* at 1035 (quoting *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (internal quotation marks and citation omitted). However, the court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citation omitted).

## THE ADMINISTRATIVE DECISION

### A.    Standard for Determining Disability

The Social Security Act ("the Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act's implementing regulations, the Commissioner applies a five-step sequential evaluation process to determine whether an applicant for benefits qualifies as disabled. *See* 20 C.F.R. § 404.1520(a)(4). "The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

– 3 –

At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[1] 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled. If not, the ALJ proceeds to step two.

At step two, the ALJ must determine whether the claimant has a severe medical impairment, or combination of impairments, that meets the duration requirement in the regulations. *Id.* § 404.1520(a)(4)(ii). If the claimant's impairment or combination of impairments is not severe, or does not meet the duration requirement, the claimant is not disabled. If the impairment is severe, the analysis proceeds to step three.

At step three, the ALJ must determine whether the severity of the claimant's impairment or combination of impairments meets or medically equals the severity of an impairment listed in the Act's implementing regulations.[2] *Id.* § 404.1520(a)(4)(iii). If so, the claimant is disabled. If not, the analysis proceeds to step four.

At step four, the ALJ must determine whether the claimant's residual functional capacity ("RFC")—that is, the most she can do despite her physical and mental limitations—is sufficient for the claimant to perform her past relevant work. *Id.* § 404.1520(a)(4)(iv). The ALJ assesses the RFC based on all relevant evidence in the record. *Id.* §§ 416.945(a)(1), (a)(3). If the claimant can perform her past relevant work, she is not disabled. If not, the analysis proceeds to the fifth and final step.

At step five, the Commissioner bears the burden of proving that the claimant can perform other work that exists in significant numbers in the national economy, taking into the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1560(c)(1), (c)(2); *see also* 20 C.F.R. § 404.1520(g)(1). The ALJ usually meets this burden through the testimony of a vocational expert, who assesses the employment potential of a hypothetical individual with all of the claimant's physical

---

[1] "Substantial gainful activity" is work activity that (1) involves significant physical or mental duties and (2) is performed for pay or profit. 20 C.F.R. § 404.1510.

[2] The relevant impairments are listed at 20 C.F.R. part 404, subpart P, appendix 1.

and mental limitations that are supported by the record. *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (citations omitted). If the claimant is able to perform other available work, she is not disabled. If the claimant cannot make an adjustment to other work, she is disabled. *Id.* § 404.1520(a)(4)(iv).

**B.     The ALJ's Disability Determination**

On December 17, 2014, the ALJ issued a written decision concluding that Marshall was not disabled within the meaning of the Act. At step one, the ALJ found that Marshall had not engaged in substantial gainful activity since February 7, 2011, the alleged onset date of disability. (AR 24.) At step two, the ALJ found that Marshall had the following severe medically determinable impairments: migraine headaches, fibromyalgia, and chronic pain syndrome. (*Id.*) He found that Marshall's depression was not a severe impairment for purposes of step two.

At step three, the ALJ determined that Marshall's impairments, alone and in combination, did not meet or medically equal the severity of the impairments listed in the regulations. (AR 25–26.) At step four, the ALJ assessed that Marshall had the RFC to perform "light work" as defined in the Social Security regulations, with the following restrictions:

> [Marshall can] lift and carry 20 pounds occasionally, 10 pounds frequently, sit for six hours in an eight hour workday and stand/walk for six hours in an eight hour workday, with normal 10-minute breaks and restricted fine manipulation and upper extremity reaching limited to occasionally in an eight hour workday.

(AR 26.)

Ultimately, on the basis of Marshall's RFC and the testimony of a vocational expert who considered the impact of Marshall's limitations, the ALJ concluded that Marshall could not perform her past relevant work. (AR 31.)

Finally, at step five, the ALJ called upon a vocational expert to testify as to what jobs Marshall could perform given her RFC, age, education, and work experience, and the availability of suitable jobs in the national economy. The

– 5 –

vocational expert testified that an individual with Marshall's profile could perform certain unskilled, light level occupations such as information clerk, ticket taker, and recreation aide. (AR 32.) Based on this testimony, the ALJ determined that Marshall was capable of adjusting to other work available in the national economy, and therefore found Marshall "not disabled" under the meaning of the Social Security Act. (*Id*.)

In reaching his decision, the ALJ largely rejected the opinions of three of Marshall's treating doctors, Drs. Kirstin Filizetti, Roshan Kotha, and William Chapman, all of whom found significant limitations in Marshall's capacity to work. The ALJ instead credited the opinions of state agency examining physicians Drs. Soliman and Sabourin, who found that Marshall had no significant mental or orthopedic limitations. The ALJ also discredited Marshall's testimony regarding the severity of her symptoms. He found instead that factors such as Marshall's conservative course of treatment and her ability to carry out daily activities rendered her pain testimony "not entirely credible." (AR 28.)

## DISCUSSION

Marshall challenges the ALJ's decision on two grounds. First, she argues the ALJ erred in giving little to no weight to the opinions of Drs. Filizetti, Kotha, and Chapman. Second, she argues the ALJ erred in discrediting her testimony regarding her pain. The Commissioner contends the ALJ properly evaluated the medical opinions in question, and properly assessed the credibility of Marshall's testimony. The parties also dispute the appropriate remedy, should the Court find the ALJ committed legal error.

### A.  Opinions of Treating Physicians

The Social Security Act's implementing regulations distinguish among the opinions of three types of physicians:[3] "(1) those who treat the claimant (treating

---

[3] Dr. Filizetti, a licensed clinical psychologist, is a PhD rather than an MD, and so is not technically

physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Holohan v. Massanari*, 246 F.3d 1195, 1201–02 (9th Cir. 2001) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). As a general rule, the opinion of a treating doctor is entitled to greater weight than the opinion of doctors who do not treat the claimant.[4] *Lester*, 81 F.3d at 830 (citation omitted). "The rationale for giving greater weight to a treating physician's opinion is that he is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citation omitted).

The degree of deference afforded to a treating source's opinion depends partly upon whether, and to what extent, that opinion is contradicted. An uncontradicted opinion by a treating doctor is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory techniques" and is "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Such opinions may be rejected "only for 'clear and convincing' reasons supported by substantial evidence in the record." *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (quoting *Lester*, 81 F.3d at 830). In cases where a treating doctor's opinion is contradicted by another doctor's, an ALJ may only reject the treating doctor's opinion with "specific and legitimate reasons that are supported by substantial evidence."

---

a physician. However, Filizetti is a "treating source" under the Social Security Act's implementing regulations, *see* 20 C.F.R. § 404.1527(a)(2), and so the legal standard governing her medical opinion is the same standard that applies to Drs. Kotha and Chapman, who hold MDs.

[4] The Court notes that the so-called "treating physician rule" described herein applies only to claims filed before March 27, 2017. In evaluating claims filed on or after March 27, 2017, the Social Security Administration no longer "defer[s] or give[s] any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c. Instead, medical opinions accompanying claims filed on or after March 27, 2017 are considered using a common set of factors, including the extent to which the opinion is accompanied by objective medical evidence and supporting explanations. *Id.*

– 7 –

*Garrison*, 759 F.3d at 1012 (quoting *Ryan*, 528 F.3d at 1198). An ALJ satisfies the substantial evidence requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id*. (quoting *Reddick*, 157 F.3d at 725). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Reddick*, 157 F.3d at 725.

### 1. Dr. Filizetti's Opinion

Dr. Filizetti, a licensed clinical psychologist, treated Marshall from December 2012 through February 2013, and again in February and March of 2014. At their initial session, Marshall reported to Filizetti a history of grief and major depressive disorder. (AR 335.) During their subsequent treatment sessions, Filizetti repeatedly noted that Marshall presented as dysphoric, anxious, tearful, and depressed. (*See, e.g.*, AR 335, 418, 419.) On two separate occasions—December 7, 2012 and December 28, 2012—Filizetti assessed Marshall's Global Assessment of Functioning ("GAF") scale at 50,[5] indicating "serious symptoms" or any "serious impairment in social, occupational or school functioning." (AR 332, 335). Filizetti ultimately diagnosed dysthymic disorder, a type of chronic depression, based on "clinical interview and clinical behavioral observations." (AR 386.)

On March 5, 2014, Filizetti completed a "mental impairment questionnaire" in which she discussed the nature and severity of Marshall's condition. (AR 388–92.) She diagnosed Marshall with both dysthymic disorder and generalized anxiety disorder. (AR 388.) With respect to the signs and symptoms that supported the diagnoses, Filizetti noted Marshall's constricted affect, feelings of guilt and

---

[5] The GAF scale is a scale used by mental health practitioners to assess an individual's level of psychological, social, and occupational functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. 1994) ("DSM-IV"). A GAF between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupation or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32.

– 8 –

worthlessness, anxiety, tension, pressured and slowed speech, decreased energy, and irregular sleep pattern. (AR 389.) She assessed that Marshall's symptoms cause "marked" limitations in her ability to complete a normal workday without interruptions from psychological symptoms.[6] (AR 391.) She also assessed that Marshall's symptoms cause "moderate-to-marked" limitations in her ability to: maintain attention and concentration for extended periods; perform at a consistent pace without rest periods of unreasonable length or frequency; accept instructions and respond appropriately to criticism from supervisors; and get along with co-workers without distracting them, among other limitations.[7] (AR 391.) Filizetti estimated that Marshall would likely miss work two to three times per month due to her psychological symptoms. (AR 392.)

The state examining psychiatrist, Dr. Soliman, examined Marshall on January 7, 2013. (AR 339–44.) He conducted a mental status examination and found, among other things, that Marshall's speech was "soft and of decreased rate and rhythm," that she was alert and oriented to person, place, and time, that her abstract thinking was normal, that her insight was good, that her mood was depressed, and that the relevant clinical signs and symptoms were significant for "decreased concentration" and "decreased energy." (AR 341–42.) Soliman diagnosed "major depression," assessed a GAF of "about 66," and concluded that Marshall "is able to withstand the stress and pressures associated with an eight-hour workday[.]" (AR 342–43.)

The ALJ credited Soliman's opinion and gave little, if any weight to Filizetti's.

---

[6] On the mental impairment questionnaire, "marked" limitation describes a situation where a patient's symptoms "constantly interfere" with the patient's ability to carry out the designated mental activity in a competitive work environment. (AR 391.) "Constant" interference, in turn, is interference that disrupts more than two-thirds of an eight-hour workday. *Id.*

[7] On the mental impairment questionnaire, "moderate-to-marked" limitation describes a situation where a patient's symptoms "frequently interfere" with the patient's ability to carry out the designated mental activity in a competitive work environment. (AR 391.) "Frequent" interference, in turn, is interference that disrupts between one-third and two-thirds of an eight-hour workday. *Id.*

– 9 –

He proffered four reasons for rejecting Filizetti's opinion. First, he stated that the number of treatment sessions was insufficient for Filizetti to properly assess Marshall's mental limitations. (AR 26.) Second, the ALJ emphasized that Filizetti did not complete a formal mental status examination ("MSE"), or other standard psychological test, and found Filizetti's reliance on "interview and behavior" to be insufficient.[8] (AR 27.) Third, the ALJ asserted that Filizetti's opinion was contradicted by evidence that Marshall's condition improved with treatment. (AR 29.) Finally, the ALJ argued that Filizetti's opinion was in the form of a conclusory "check-box" questionnaire with no further explanation to support her findings. (*Id.*)

The Court finds the ALJ did not provide specific and legitimate reasons supported by substantial evidence to reject Filizetti's opinion. First, the ALJ's argument that the number of treatment sessions was insufficient to support Filizetti's opinion is unavailing. At the time of her March 5, 2014 assessment of Marshall's mental function limitations, Filizetti had examined Marshall ten times: eight treatment sessions between December 2012 and February 2013, with two additional sessions in February and March of 2014. During these sessions, Filizetti counseled, evaluated, observed, and diagnosed Marshall, and recorded treatment notes. This is more than sufficient substantive contact to establish Filizetti as a treating physician whose opinion is entitled to deference. *See Ghokassian v. Shalala*, 41 F.3d 1300, 1303 (9th Cir. 1994) (holding that a physician who treated claimant twice within a 14-month period was "without doubt" a treating physician whose opinion was entitled to deference); *see also Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir. 2003) (noting that Social Security regulations do not establish a "floor" for the

---

[8] Plaintiff points out, and the Commissioner does not refute, that the MSE is a structured framework used by mental health professionals to observe and describe a patient's psychological functioning at a given point in time. *See* Paula T. Trzepacz & Robert W. Baker, The Psychiatric Mental Status Examination (1993). The standard MSE evaluates areas such as appearance, attitude, behavior, mood and affect, speech, thought process, thought content, perception, cognition, insight, and judgment. *Id*.

minimum number of contacts needed to credit a physician treating status, but instead considers whether the frequency of contact is consistent with accepted medical practice for the type of treatment and evaluation of the claimant's medical condition). The ALJ has provided no reason why the ten sessions in this case were insufficient or inconsistent with accepted medical practice. Thus, under these circumstances, the number of treatment sessions is not a legally sufficient reason to reject Filizetti's opinion.[9]

Second, the ALJ's argument that Filizetti's failure to conduct an MSE means her opinion unduly relied on Marshall's subjective complaints is not supported by substantial evidence. Although it is true Filizetti did not conduct an MSE, and that Dr. Soliman did, it is also the case that Filizetti's clinical notes cover several of the categories included on an MSE. These include observations and assessments regarding Marshall's appearance, attitude, behavior, mood and affect, and thought content. (AR 417–21.) During various sessions, Filizetti documented that Marshall presented as "dysphoric, anxious and tearful" (AR 335); "tearful, depressed, and dysphoric" (AR 419); and "dysphoric, anxious, and depressed" (AR 418). She also assessed Marshall's GAF scale on two separate occasions. These types of clinical observations require expertise; they are not a mere parroting of Marshall's subjective complaints. The ALJ cites no authority for the proposition that clinical observations not made within the framework of an MSE are afforded less weight than those made as part of an MSE. Thus, the fact that Filizetti did not conduct a formal MSE is not a

---

[9] The Commissioner cites the year-long gap between Filizetti's February 2013 and February 2014 sessions with Marshall as grounds for rejecting Filizetti's opinion. (Def.'s Mot. Summ. J. 20:4–7.) The Court finds this argument unpersuasive. Filizetti treated Marshall on two separate occasions in the 10 days immediately preceding her completion of the mental impairment questionnaire on March 5, 2014. (AR 388, 416.) The Court finds this was sufficient contact for Filizetti to update her observations and diagnoses of Marshall's condition, and the Commissioner provides no reason to find otherwise.

legally sufficient reason to reject her opinion regarding Marshall's limitations.[10]

Third, the ALJ's contention that Filizetti's opinion is contradicted by evidence that Marshall's symptoms improved with treatment is unavailing. For one, it is unclear what "improvement" the ALJ is citing given that the example he references is to treatment regarding Marshall's migraines, a condition that Filizetti was not treating. (AR 29.) Vague assertions of a patient's "improvement" are insufficient to reject a treating source's medical opinion. *See Garrison*, 759 F.3d at 1012 (quoting *Reddick*, 157 F.3d at 725) ("The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct."). Furthermore, to the extent Marshall's symptoms may have occasionally improved during treatment, this does not undermine Filizetti's ultimate opinion regarding Marshall's mental limitations where, as here, "the overall diagnostic picture" is consistent with chronic depression. *Holohan*, 246 F.3d at 1205. "The fact that a person suffering from depression makes some improvement 'does not mean that the person's impairment no longer seriously affect[s] her ability to function in a workplace." *Ghanim*, 763 F.3d at 1162 (quoting *Holohan*, 246 F.3d at 1205). Thus, under these circumstances, the ALJ's assertions regarding improvement in Marshall's mental health is not a legally sufficient reason to reject Filizetti's opinion.

Fourth, the ALJ's argument that Filizetti's opinion was presented on an invalid "check-box" form with no supporting explanations or objective evidence is

---

[10] The Court also notes there is no indication Filizetti relied more heavily on Marshall's self-reporting, than on Filizetti's own observations and analysis, in reaching her opinion regarding Marshall's mental limitations. Thus, Marshall's description of her symptoms is not a proper basis for rejecting Filizetti's opinion. *See Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) ("[W]hen an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion."). Nor was Filizetti precluded from taking into account Marshall's subjective complaints where Filizetti made no finding that Marshall was malingering or deceptive. *See Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1300 (9th Cir. 1999) (finding that a physician could not be faulted for believing a claimant's subjective complaints where the physician finds no indication the claimant was malingering or deceptive).

– 12 –

unfounded. Contrary to the ALJ's assertions, Filizetti did, in fact, offer commentary and handwritten responses to many of the questions on the mental impairment questionnaire. (AR 388–92.) More importantly, the "check-box" form and written responses were not unsupported by evidence—Filizetti's progress notes contain clinical findings and observations that support her conclusions. (AR 416–21.) This supporting documentation distinguishes the instant case from *Batson v. Comm'r of Soc. Sec. Admin.*, where the court rejected physicians' opinions that were in the form of a conclusory checklist "unsupported by the record as a whole or by objective medical findings." 359 F.3d 1190, 1195 (9th Cir. 2004) (citations omitted). Here, Filizetti's opinion is supported by the clinical findings and behavioral observations contained in her progress notes. Thus, the "check-box" format of the mental impairment questionnaire is not a legally sufficient reason to reject Filizetti's opinion.

Finally, the ALJ's suggestion that Marshall's ability to carry out certain daily activities undermines Filizetti's opinion is unconvincing. As an initial matter, the ALJ's reading of the record is overly narrow. The ALJ points to a report by Dr. Soliman indicating that Marshall is able to run errands, cook, maintain self-care and personal hygiene, and get along well with family, friends, and neighbors. (AR 341.) However, the record as a whole provides a more nuanced picture. For example, although Marshall is able to cook, she also testified that in the past she could cook every day, but now can only do so once or twice a month. (AR 56.) Marshall also testified that even as she can perform certain daily activities, she is also prone to bouts of crying for no apparent reason. (AR 55, 56.) Taken as a whole, the record hardly reflects the high-functioning individual the ALJ attempts to portray. The ALJ may not cherry-pick the record to support his disability determination. *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

– 13 –

In addition, the fact that Marshall can perform certain routine daily activities does not mean, a fortiori, that she can withstand the pressures of the workplace. The demands of daily living and of a competitive work environment are not facially analogous. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."). Only where a claimant's level of daily activity is inconsistent with the limitations alleged can those activities be treated as evidence of an ability to work. *See Reddick*, 157 F.3d at 722 (explaining that a claimant's daily activities are only relevant to an ability to work when the level of activity is inconsistent with the alleged limitations). That is not the case here—the basic activities cited by the ALJ are largely irrelevant to competitive work, and the ALJ does not discuss what he believes to be the connection between Marshall's level of activity and her ability to work. Thus, Marshall's ability to engage in certain daily activities is not a legally sufficient reason to reject Filizetti's opinion. *See Ghanim*, 763 F.3d at 1161 (finding that a claimant's limited daily activities—including performing basic chores and occasionally socializing—were not in tension with treating providers' opinion that claimant's depression made it unlikely he would be able to engage in meaningful employment in the near future).

In sum, the ALJ did not provide specific and legitimate reasons supported by substantial evidence to reject Filizetti's opinion. Thus, the ALJ committed legal error.

## 2. Dr. Kotha's Opinion

Dr. Roshan Kotha, a rheumatologist, treated Marshall for fibromyalgia—a condition characterized by inflammation of the fibrous connective tissue components of muscles, tendons, and ligaments. *See Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004). "There are no laboratory tests for the presence or severity of fibromyalgia." *Rollins v. Massanari*, 261 F.3d 853, 855 (9th Cir. 2001) (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). Instead, a patient is evaluated

– 14 –

for fibromyalgia using either the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia ("1990 Criteria") or the 2010 American College of Rheumatology Preliminary Diagnostic Criteria ("2010 Criteria"). *See* Social Security Ruling 12–2p, 2012 WL 3104869, at *2–3 (July 25, 2012). A diagnosis under the 1990 Criteria requires a patient to have a "history of widespread pain" and pain in at least 11 of 18 "tender point sites" on physical examination.[11] *Id*. at *3. A diagnosis under the 2010 Criteria requires a patient to have a "history of widespread pain" and "repeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions," such as fatigue, cognitive or memory problems, and waking unrefreshed. *Id*. Under either set of criteria, the patient's subjective reports of pain are central to the diagnosis. *See Benecke*, 379 F.3d at 589–90.

Kotha treated Marshall from December 2013 to August 2014, and again in November 2014 and April 2015. Kotha's initial examination revealed multiple positive tender points ("trigger points") in the trapezius, lower back, epicondyles, and second rib, as well as muscle spasms. (AR 445.) After follow-up examinations again indicated multiple trigger points, Kotha diagnosed fibromyalgia, and prescribed various pain medications, including Lyrica. Kotha also advised Marshall to walk for exercise.

On a fibromyalgia questionnaire dated August 7, 2014, Kotha assessed the functional limitations stemming from Marshall's fibromyalgia. (AR 449–53.) She noted that Marshall meets the diagnostic criteria for fibromyalgia under either the 1990 Criteria or 2010 Criteria, and that no other diagnoses better explain her symptoms and limitations. (AR 450.) Kotha also noted that Marshall experiences

---

[11] Under the 1990 Criteria, the 18 tender point sites are: the occiput, low cervical, trapezius, supraspinatus, second rib, lateral epicondyle, gluteal, greater trochanter, and knee. *See* The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia, 33 Arthritis and Rheumatism 160, 169 (1990). Each of the nine categories encompasses two points each, thus accounting for the total 18 tender points.

chronic widespread pain affecting her neck, upper and lower back, upper and lower legs, hip, and shoulder. (*Id.*)

Kotha estimated that Marshall could sit no more than two hours and stand or walk no more than two hours in an eight-hour workday, with the need to get up and move around for 10–15 minutes every hour. (AR 452.) She estimated that Marshall could lift and carry no more than 20 pounds occasionally, 10 pounds frequently, and could no more than occasionally perform fine manipulations or reach. (*Id.*) Kotha estimated that Marshall would need to take two to three unscheduled breaks per day for 15–30 minutes each time. Kotha also opined that Marshall's symptoms would likely increase if she were placed in a competitive work environment, and that she would likely miss more than three workdays per month because of her symptoms. (AR 453.)

Dr. Sabourin, the state examining orthopedist, examined Marshall on January 21, 2013. (AR 348–52.) Among other things, Sabourin found that Marshall had normal range of motion in all extremities, and normal motor strength. He noted that Marshall complained of pain throughout her shoulders, elbows, and wrists, and acknowledged some tenderness in Marshall's back and neck. However, Sabourin found there were "no significant objective findings." (AR 352.) He ultimately diagnosed "generalized pain syndrome" and reported that Marshall had no significant orthopedic limitations.

The ALJ gave significant weight to Sabourin's opinion while largely rejecting Kotha's. He provided four reasons for rejecting Kotha's opinion. (AR 27.) First, the ALJ noted that Marshall's symptoms improved after receiving cortical steroid injections at the identified trigger points. Second, the ALJ asserted that Marshall did not take her prescribed Lyrica consistently. Third, the ALJ stated there was "no specific evidence" supporting Kotha's opinion that Marshall's symptoms would increase if she were placed in a competitive work environment, or that Marshall was likely to miss work more than three times per month due to her symptoms. Finally,

– 16 –

the ALJ noted that on physical examination Marshall had full range of motion in all peripheral joints, which he presumably believed contradicted Kotha's assessment of Marshall's physical limitations.

The Court notes first that Kotha's opinion is not directly contradicted by another doctor. Although Dr. Sabourin diagnosed generalized pain syndrome and found no significant physical limitations, there is no indication that Sabourin considered whether Marshall had fibromyalgia. In particular, there is no indication Sabourin considered the ACR's 1990 Criteria or 2010 Criteria, which are the relevant diagnostic standards. Therefore, rather than contradict Kotha, Sabourin essentially side-stepped the diagnostic basis for Kotha's opinion. Accordingly, the Court finds that Kotha's opinion has not been contradicted by another physician, and so may be rejected only for clear and convincing reasons supported by substantial evidence. And even if the Court were to conclude that Sabourin's report contradicted Kotha's, the ALJ's reasons are still insufficient under the specific and legitimate reasons standard.

First, although Marshall at various times reported improvement in her symptoms following trigger point injections, the record overall indicates the improvement was partial and temporary. For example, although Marshall reported that trigger point injections administered in March of 2014 had helped significantly, the pain soon returned. (AR 427, 430.) To take another example, Marshall reported in August of 2014 that a separate series of injections helped alleviate her pain, but also reported that the pain returned and ultimately worsened. (AR 422, 424, 429.) The ALJ appears to have ignored the temporary nature of Marshall's improvement, and instead assumed that any report of improvement, no matter how temporary, was sufficient to reject Kotha's assessment. This was improper. *See Holohan*, 246 F.3d at 1205 (finding that observations that a claimant's condition had improved must be read "in the context of the overall diagnostic picture"); *see also Tully v. Colvin*, 943 F. Supp. 2d 1157, 1166 (E.D. Wash. 2013) ("The fact that during some doctor visits Plaintiff reported that her pain had temporarily improved, does not establish Plaintiff

– 17 –

retained the ability to work."). Read in their totality, Kotha's treatment records indicate that Marshall suffers persistent pain. Thus, Marshall's temporary improvement is not a legally sufficient reason to reject Kotha's opinion regarding Marshall's physical limitations. *See, e.g.*, *Lester*, 81 F.3d at 833 ("Occasional symptom-free periods—and even the sporadic ability to work—are not inconsistent with disability.") (citations omitted).

Second, the ALJ's assertion that Marshall did not take her Lyrica consistently is both overstated and, under the circumstances presented, irrelevant. Kotha did note in her treatment notes dated August 4, 2014, that Marshall was not taking Lyrica consistently. But the inconsistency began only after Marshall reported the medication was no longer helping and, after discussing with Kotha, stopped taking it. (AR 429.) Marshall resumed taking Lyrica on her own initiative, and it is in this context that the inconsistency occurred. Indeed, Kotha confirmed in the fibromyalgia questionnaire that Marshall had complied with the prescribed treatment regimen. (AR 451). Thus, the fact that Marshall took Lyrica inconsistently after having stopped taking it due to its inefficacy is not a legally sufficient reason to reject Kotha's opinion. *Cf. Fair*, 885 F.2d at 602 (stating that an ALJ may not "rely on a claimant's failure to take pain medication" to discredit pain testimony "where evidence suggests that the claimant had a good reason for not taking medication").

Third, the ALJ's assertion that "no specific evidence" supports Kotha's opinion regarding Marshall's physical limitations in a competitive work environment belies the record. The record contains several sets of progress and treatment notes regarding Marshall's symptoms, including Kotha's screening of tender points, the most relevant clinical evidence for assessing fibromyalgia. (*See, e.g.*, AR 488, 491, 495, 501–02.) Thus, the ALJ's contention regarding a lack of evidence is incorrect.

Finally, the ALJ's statement that Marshall had full range of motion in all peripheral joints does not undermine Kotha's diagnosis and ultimate opinion regarding Marshall's physical limitations. For one, the examinations that indicated

– 18 –

full range of joint motion also indicated positive tender points at the trapezius, lower back, epicondyles, and second rib, and tenderness in both trapezii, arms, legs, and sciatic notches. (AR 424, 428, 440, 445.) Tender points are, of course, the most relevant evidence for evaluating fibromyalgia, and by extension an important consideration in assessing any related functional impact. The ALJ, however, focused only on evidence of full range of joint motion, even as he provided no support for the medical presumption that full range of joint motion is inconsistent with fibromyalgia, or with pain associated with fibromyalgia. Indeed, fibromyalgia patients "manifest normal muscle strength and neurological reactions and have a full range of motion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007); *see also Lisa v. Sec'y of Dept. of Health & Human Servs.*, 940 F.2d 40, 44 (2d Cir. 1991) ("In stark contrast to the unremitting pain of which [fibromyalgia] patients complain, physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.") (citation omitted). Thus, the ALJ's focus on range of joint motion, which is not facially relevant to a fibromyalgia diagnosis, is not a proper grounds for rejecting Kotha's opinion.

In sum, the ALJ did not provide legally sufficient reasons to reject Kotha's opinion. Thus, his rejection of Kotha's opinion constituted legal error. However, the Court does have some concerns regarding the specifics of Kotha's fibromyalgia diagnosis under the ACR's 1990 Criteria and 2010 Criteria. The ALJ did not cite this as grounds for rejecting Kotha's opinion,[12] but the extent to which Kotha's diagnosis adhered to ACR Criteria is relevant to the weight Kotha's opinion should receive. The Court addresses these concerns as part of its analysis of whether to remand the case for further proceedings. Here, the Court finds only that the ALJ did not provide

---

[12] The Court does not go out of its way to uphold an ALJ's decision with reasons that the ALJ himself did not provide. *See Garrison*, 759 F.3d at 1010.

clear and convincing, or specific and legitimate, reasons supported by substantial evidence to reject Kotha's opinion.

### 3. Dr. Chapman's Opinion

Dr. William Chapman, a neurologist, treated Marshall for migraines, anxiety, and numbness and tingling in her hands and fingertips, mainly on the right side. On December 13, 2012, Chapman performed a Tinel's test that indicated irritated nerves on the right. (AR 265.) Chapman conducted an electromyogram on January 10, 2013, and an MRI of Marshall's cervical spine on February 2, 2013, both of which were largely within normal limits. (AR 406–08; 462–64.) On February 21, 2013, Chapman diagnosed extremity pain and numbness, and increased the dosage of the nerve pain medication previously prescribed to Marshall. (AR 357.) By March of 2013, Marshall's symptoms had worsened, at which point Chapman referred her to a rheumatologist to be evaluated for fibromyalgia. (AR 359.) At a follow-up with Chapman on February 11, 2014, Marshall reported pain, numbness, tingling, burning sensations in her hands and fingertips, and migraines. Chapman performed a Tinel's test, which was positive on the right, and diagnosed carpal tunnel syndrome. (AR 399.)

On June 9, 2014, Chapman assessed Marshall's functional limitations in light of what he diagnosed as fibromyalgia, chronic pain syndrome, and migraines. (AR 394–96.) Chapman ultimately concluded that, in an eight-hour workday, Marshall could sit for less than one hour and stand or walk for less than one hour. (AR 395.) He assessed that Marshall would need to get up and move around every 15 minutes for 15 minutes at a time, and that she could never or rarely lift or carry more than 10 pounds. (*Id.*) Finally, Chapman estimated that Marshall would likely miss work more than three times per month because of her symptoms. (AR 396.)

The ALJ rejected Chapman's opinion regarding Marshall's limitations on four grounds. First, the ALJ asserted there was no "objective medical evidence" to support the alleged symptoms. (AR 29.) Second, as with his criticism of Filizetti's opinion,

the ALJ noted that Chapman's opinion was in conclusory "check-box" form. *Id*. Third, the ALJ pointed to evidence that Marshall's symptoms improved with treatment. (*Id*.) Finally, the ALJ contended that Chapman's opinion was inconsistent with Marshall's ability to perform certain daily activities. (*Id*.)

The Court finds that although the ALJ may have been justified in not giving "controlling weight" to Chapman's opinion, he did not provide legally sufficient reasons for rejecting that opinion completely.

Under the Social Security Act's implementing regulations, a treating physician's opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527. And even when a treating physician's opinion does not meet these criteria, this "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Orn*, 495 F.3d 625, 632 (9th Cir. 2007) (quoting Social Security Ruling 96–2p at 4 (Cum. Ed. 1996), *available at* 61 Fed. Reg. 34,490, 34,491 (July 2, 1996)). In such cases, the ALJ must assess the opinion using the factors outlined in 20 C.F.R. §§ 404.1527(c)(2)-(6). These factors include: the length of the treatment relationship and the frequency of examination, the extent to which the opinion is supported by medical signs and laboratory findings, the consistency of the opinion with the record as a whole, and whether or not the treating source is a specialist regarding the issue in question. *Id*. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Ghanim*, 763 F.3d at 1161 (quoting *Orn*, 495 F.3d at 361).

Here, the ALJ's suggestion that Chapman's opinion is not well-supported by medically acceptable diagnostic techniques is well-taken—at least with respect to the fibromyalgia diagnosis. On the impairment questionnaire, Chapman cited fibromyalgia as one of the diagnoses on which he based his opinion regarding Marshall's capacity to work. (AR 394.) However, Chapman's treatment notes contain

– 21 –

no indication that he himself diagnosed Marshall using the ACR's 1990 Criteria or 2010 Criteria. Instead, the record shows that upon suspecting fibromyalgia Chapman referred Marshall to a rheumatologist for evaluation. (AR 359.) Chapman himself focused primarily on treating Marshall's migraines, carpal tunnel syndrome, and to a lesser extent, chronic pain syndrome. Thus, by drawing conclusions about Marshall's physical limitations based partly on a fibromyalgia diagnosis that he did not test for, Chapman failed to support his opinion with medically acceptable diagnostic techniques. *See Thomas v. Colvin*, 826 F.3d 953, 959 (7th Cir. 2016) ("[A] doctor's diagnosis of fibromyalgia is not alone sufficient to establish this condition as an impairment; the diagnosis must be supported by evidence meeting either of two sets of diagnostic criteria promulgated by the American College of Rheumatology, in 1990 and 2010.") (citing SSR 12-2p, 2012 WL 3104869, at *2–3 (July 25, 2012)). Consequently, Chapman's opinion regarding Marshall's physical limitations is not entitled to controlling weight.

The ALJ did not find that Chapman's opinion was not entitled to "controlling weight"; rather, he essentially rejected the opinion altogether. To do so, the ALJ would have needed to provide specific and legitimate reasons supported by substantial evidence in the record. He did not do so.

First, the ALJ's emphasis on a lack of "objective medical evidence," as it relates to the chronic pain syndrome and migraines diagnoses, overlooks the fact that these ailments are not subject to objective laboratory tests. *See Lee v. BellSouth Telecomms., Inc.*, 318 F. App'x 829, 837 (11th Cir. 2009) ("There is, quite simply, no laboratory dipstick test to diagnose chronic pain syndrome.") (citations omitted); *Wiltz v. Barnhart*, 484 F. Supp. 2d 524, 532 (W.D. La. 2006) ("Migraine headaches are particularly unsusceptible to diagnostic testing."). The ALJ does not point to the medical evidence he believes would have substantiated Chapman's opinion in this regard, an important omission given that Chapman's clinical notes and prescribed treatment regime are consistent with his diagnoses. *See Reddick*, 157 F.3d at 725

("The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct."). Thus, to the extent Chapman's opinion regarding Marshall's physical limitations is based on his chronic pain syndrome and migraines diagnoses, a lack of objective medical evidence is not a legally sufficient reason to reject that opinion.

Second, the ALJ's argument that Chapman's opinion is contradicted by evidence of Marshall's improvement reflects an overly narrow view of the record. Contrary to the ALJ's assertions, reports of improvement in Marshall's condition are sparse in the treatment record. Taken as a whole, the record indicates that Marshall's pain has been persistent, with only occasional, temporary periods of improvement. (*See* AR 257–67; 397–415.) "The ALJ cannot isolate evidence supporting his decision without weighing evidence that detracts from it." *Leal v. Colvin*, No. 2:12–cv–1129 CKD, 2013 WL 1715419, at *4 (E.D. Cal. Apr. 19, 2013); *see also Holohan*, 246 F.3d at 1205 (stating that a treating physician's statements "must be read in context of the overall diagnostic picture he draws"). Thus, in light of the overall record, Marshall's temporary improvement is not a legally sufficient reason to reject Chapman's opinion.

Third, the fact that Marshall can perform certain daily activities is not sufficient grounds to reject Chapman's opinion. For one, the level of activity described in the record is not inconsistent with Chapman's opinion regarding Marshall's physical limitations in the workplace. The ALJ noted that Marshall shops for books online, maintains personal grooming and hygiene without assistance, cooks and cleans occasionally, runs errands, and tries to walk for exercise. However, on their face, none of these activities requires Marshall to sit, stand, or walk for longer than an hour at a time, which is the main limitation assessed by Chapman. *See Reddick*, 157 F.3d at 722 (explaining that a claimant's daily activities are only relevant to a claimant's ability to work where the level of activity is inconsistent with the alleged limitations). Moreover, the demands of daily living and of a competitive work environment are

– 23 –

not facially analogous; an ability to manage self-care at home does not guarantee successful participation at work. *Cf. Fair*, 885 F.2d at 603 ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."). Here, there is no reason to find that Marshall's daily activities are transferable to competitive work, and the ALJ makes no such argument. Thus, Marshall's ability to perform certain daily activities is not a legally sufficient grounds for rejecting Chapman's opinion.

Finally, while the ALJ's rejection of Chapman's opinion as a conclusory "check-box" form holds weight with respect to the fibromyalgia diagnosis, the argument fails with respect to the chronic pain syndrome and migraines diagnoses. As the Court noted earlier, an opinion expressed in "check-box" form cannot be rejected on the basis of its form alone where the record contains treatment notes explaining and supporting the opinion. *See Esparza v. Colvin*, 631 F. App'x 460, 462 (9th Cir. 2015) (stating that the check-box form of a treating physician's opinion is not a proper basis for rejecting that opinion when it is otherwise supported by treatment notes); *Garrison*, 759 F.3d at 1013. Here, the record contains substantial notes by Chapman, including his observations of Marshall's persistent pain, numbness, blurry vision, and migraine headaches. (AR 257–67, 355–59, 397–415.) These findings support Chapman's chronic pain syndrome and migraines diagnoses, which in turn informed his assessment of Marshall's physical limitations. Thus, because the treatment record contains observations and findings that support Chapman's opinion, that opinion cannot be rejected on the basis of its "check-box" form. *See, e.g.*, *Cox v. Berryhill*, No. 2:15-cv-2221 AC, 2017 WL 714384, at *7 n.14 (E.D. Cal. Feb. 23, 2017) (noting that a physician's opinion will not be rejected on the basis of its "check-box" format where the assessment is supported by clinical findings in the record).

In sum, although the ALJ was correct to suggest Chapman's opinion should

not be given controlling weight, he did not provide legally sufficient reasons to reject that opinion altogether. Having found that an important part of Chapman's opinion was not well-supported by acceptable medical diagnostic techniques, the ALJ was required to weigh the opinion using the factors outlined in 20 C.F.R. §§ 404.1527(c)(2)-(6). Because he rejected the opinion without weighing the relevant factors, the ALJ committed legal error.

## B. Marshall's Pain Testimony

The Court turns now to the ALJ's decision to discredit Marshall's testimony regarding the severity of her pain. Marshall argues that the ALJ did not provide clear and convincing reasons for discrediting her testimony (Pl.'s Mot. Summ. J. 26–31), while the Commissioner argues the ALJ articulated enough legitimate bases for discrediting Marshall's testimony such that any error was harmless (Def.'s Mot. Summ. J. 12–16).

Marshall testified at the hearing that she stopped working in February of 2011 due to multiple absences stemming from her migraines and chronic pain. (AR 42.) She stated that pain medication helped to control her migraines in the past, but that it no longer does. (AR 50.) She testified that Botox injections have been more effective, but that she still gets headaches ten days out of a month, which can be debilitating. (AR 51, 52.)

Marshall further testified that the severity of her fibromyalgia and chronic pain is such that she can no longer perform certain activities at the level she once could. For example, she noted that she can no longer walk her dog daily; she cooks only once or twice a month whereas in the past she cooked daily; she finds it difficult to walk for exercise; and she is unable to carry her granddaughters for long periods of time. (AR 54, 56, 58.) Marshall also stated that although trigger point injections have helped her fibromyalgia, the injections "wear[] off very quickly," and she returns "to feeling lousy again within a day or two." (AR 57.) Marshall stated that she experiences severe pain in her neck, shoulders, back and hips. (AR 56.) Finally,

Marshall testified she is prone to sudden crying episodes because of her depression and sometimes finds herself crying for no reason at all. (*Id.*)

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must perform a two-step analysis." *Lingenfelter*, 504 F.3d at 1035–36. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036. The claimant need not show that her impairment could reasonably be expected to cause the *severity* of the symptoms alleged; only that it could reasonably have caused *some* degree of symptoms. *Id.* (citing *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)); *see also Reddick*, 157 F.3d at 722 ("Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").

Second, if the first step is satisfied, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834 (citation omitted).

Here, the ALJ found that Marshall satisfied step one, but proffered several reasons why her testimony regarding the severity of her symptoms was largely not credible.[13] The Court addresses these reasons in turn.

First, the ALJ asserted that Marshall's testimony is contradicted by the fact she

---

[13] The ALJ did not make a finding of malingering. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each.").

performs certain daily activities, including walking for exercise, helping care for her grandchildren, and shopping for books online. (AR 28.) "Contradiction with a claimant's activities of daily living is a clear and convincing reason for rejecting a claimant's testimony." *Moon v. Colvin*, 139 F. Supp. 3d 1211, 1220 (D. Or. 2015) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008)). But here none of Marshall's activities is inconsistent with her claimed physical and mental limitations. Marshall can engage in all of the basic activities noted and still experience severe pain and depression, particularly given that she testified her symptoms fluctuate, often unpredictably, from mild to severe. (AR 50–52, 55, 56.) Thus, because Marshall's daily activities do not contradict her pain testimony, Marshall's level of activity is not a legitimate grounds for discrediting that testimony. *See, e.g.*, *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.").

Nor are Marshall's daily activities indicative of transferable work skills such that they can be the basis of an adverse credibility determination. Under Ninth Circuit law, "if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's allegations upon making specific findings relating to those activities." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (citations omitted). Here, there is no indication that Marshall's daily activities involve skills that are transferable to a work setting. Indeed, the ALJ makes no argument or specific findings on this point, and so the transferability of Marshall's daily activities is not a legitimate grounds for rejecting her testimony.

Second, the ALJ emphasized a supposed lack of physical evidence as reason to discredit Marshall's testimony. Specifically, the ALJ stated there was no evidence of "significant muscle weakness" or "muscle wasting," and that Marshall had full

– 27 –

range of motion in all peripheral joints. (AR 28.) The ALJ also asserted that Marshall's testimony regarding her mental limitations was not credible because it was supported only by Filizetti's clinical observations, which the ALJ considered to be unduly based on Marshall's subjective complaints. (*Id.*)

The ALJ's "lack of physical evidence" argument betrays a misunderstanding of Marshall's medical conditions. For example, the ALJ cites evidence of Marshall's normal muscle strength and full range of joint motion, but this evidence does not contradict a fibromyalgia diagnosis. As the Court explained above, an individual with fibromyalgia will typically have normal muscle strength, reflexes, and no joint swelling. *Lisa*, 940 F.2d at 40. "Indeed, it is the absence of symptoms ordinarily associated with joint and muscle pain that is one of the most striking aspects of this disease[.]" *Moore v. Barnhart*, 114 F. App'x 983, 991 (10th Cir. 2004). Thus, citing normal muscle strength and full range of joint motion—factors not relevant to a fibromyalgia diagnosis—does not undermine Marshall's testimony regarding the pain associated with her fibromyalgia.[14]

The ALJ also is incorrect, for the reasons noted earlier by the Court, that Filizetti's clinical observations were insufficient for diagnosing chronic depression. In her treatment notes, Filizetti did not merely record Marshall's complaints of pain, she recorded her own clinical observations, including findings that overlap with categories included on an MSE. Clinical observations are, of course, a legitimate basis for making a diagnosis. *See Ryan*, 528 F.3d at 1199–1200. Thus, the ALJ's reliance on an alleged lack of objective evidence is not a legitimate reason to discredit Marshall's testimony.

Third, the ALJ pointed to the "conservative" nature of Marshall's treatment— e.g., taking prescribed medications, receiving trigger point injections for her

---

[14] Similarly, the ALJ does not specify how normal muscle strength and full range of joint motion undermine reports of pain related to Marshall's chronic pain syndrome or migraines.

fibromyalgia, receiving Botox injections for her migraines—as reason to discredit her testimony. As a general matter, a conservative course of treatment can undermine a claimant's allegations of pain. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008). However, a conservative course of treatment is not a proper basis for rejecting a claimant's allegations of pain where the claimant has good reason for not seeking more aggressive treatment, or where more aggressive treatment options do not exist. *Id.*; *see also Lapeirre–Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010) ("A claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist.").

Here, there is no indication that a more aggressive treatment regime was available. For example, there is no cure for fibromyalgia—individuals suffering from the disease can only try and manage their symptoms. *Benecke*, 379 F.3d at 590. In this case, Marshall was prescribed and took a variety of pain medications; she received a series of trigger point injections; and she engaged in physical therapy to the extent her pain allowed. There is no suggestion that Marshall's doctors proposed a more aggressive course of treatment (for her fibromyalgia or for her other conditions) that Marshall declined to pursue. Nor does the ALJ suggest that another course of treatment was available. Thus, under these circumstances, the ALJ could not rely on a conservative course of treatment to discredit Marshall's pain testimony. *Lapeirre–Gutt*, 382 F. App'x at 664; *see also Moon*, 139 F. Supp. 3d at 1220 ("[T]he fact that treatment may be routine or conservative is not a basis for finding subjective symptom testimony unreliable absent discussion of the additional, more aggressive treatment options the ALJ believes are available.") (citation omitted).

Fourth, the ALJ discounted Marshall's testimony because she reported improvement with treatment. However, as the Court noted earlier, the ALJ overstates the nature and degree of Marshall's improvement. For example, although medication such as Lyrica helped Marshall with the numbness and tingling sensation in her hands, it did not help with the pain in her neck, shoulders, back, and hips. (AR 56.)

Similarly, trigger point injections helped to alleviate Marshall's pain at tender point sites, but the relief was short-lived. (AR 56, 57.) Finally, Botox injections offered temporary relief, but the pain ultimately returned. (AR 422, 430.) On this record, there has not been the type of sustained improvement in Marshall's symptoms that would justify discrediting her testimony. *See, e.g.*, *Tully*, 943 F. Supp. 2d at 1165–66 (noting that a claimant's occasional improvement in managing her symptoms does not in itself undermine the credibility of her pain testimony).

Finally, with respect to Marshall's testimony regarding her chronic depression, the ALJ stated that the "objective medical evidence"—presumably the report by examining physician Dr. Soliman—shows that Marshall is able to think and communicate, and act in her own best interest. (AR 28.) However, the ALJ does not explain how Marshall's ability to think and communicate, and act in her own best interest—not an especially high bar of functionality—is inconsistent with Marshall's testimony or with an inability to participate in a competitive work environment. Here, neither Marshall's testimony, nor Soliman's finding that Marshall can think and act in her own best interest, contradicts Filizetti's opinion that Marshall cannot maintain attention and concentration for extended periods, or complete a full workday without interruptions from psychological symptoms. Marshall's ability to survive a day at home does not undermine her testimony regarding the severity of her depression. *Cf.* *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (noting that a critical difference between daily living and a full-time job is that "a person . . . is not held to a minimum standard of performance, as she would be by an employer").

In sum, the ALJ did not provide specific, clear and convincing reasons to discredit Marshall's testimony regarding the severity of her pain. Thus, the ALJ committed legal error in concluding that Marshall's testimony was not credible.

## C.    Harmless Error Analysis

Having concluded the ALJ erred in giving little to no weight to the opinions of Marshall's treating doctors, and in discounting Marshall's pain testimony, the Court

– 30 –

must now determine whether such error was harmless. "[A]n ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability determination.'" *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (quoting *Carmickle*, 533 F.3d at 1162). In assessing whether an error is harmless, the court "look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Id.*

Here, the ALJ's errors were not harmless. In rejecting the opinions of Marshall's treating doctors, and Marshall's testimony, the ALJ based Marshall's RFC almost exclusively on the opinions of the state's examining physicians, Drs. Soliman and Sabourin. (AR 30–31.) These physicians found no significant mental or orthopedic limitations, and so the ALJ's RFC determination overstated Marshall's capacity to work. This incorrect RFC assessment, in turn, distorted the ALJ's determination of whether Marshall could adjust to other work in the national economy. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) ("[A]n RFC that fails to take into account a claimant's limitations is defective."). Thus, the ALJ's errors infected the ultimate disability determination. Accordingly, the Court finds the ALJ committed harmful legal error.

## D.    Appropriate Remedy

The parties disagree over the proper remedy should the Court find the ALJ committed harmful legal error. Marshall urges the Court to remand for an immediate award of benefits. She contends that the record has been fully developed, and that under the "credit as true rule," the opinions of Drs. Filizetti, Kotha, and Chapman corroborate Marshall's testimony and compel the conclusion that Marshall is disabled under the meaning of the Social Security Act. (Pl.'s Mot. Summ. J. 31–32.) The Commissioner argues that inconsistencies and ambiguities in the record render the credit as true rule inapplicable, and therefore a remand for benefits is unwarranted. (Def.'s Opp'n 23–25). In the Commissioner's view, the proper course is to remand for further proceedings. The Court agrees with the Commissioner.

Under 42 U.S.C. § 405(g), a district court may "revers[e] the decision of the

– 31 –

Commissioner of Social Security, with or without remanding the cause for a rehearing." However, even when an ALJ errs in denying benefits, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Hill*, 698 F.3d at 1162 (quoting *Benecke*, 379 F.3d at 595). This "ordinary remand rule" respects the Commissioner's role in developing the factual record, and helps guard against the displacement of administrative judgment by judicial decree. *See Treichler*, 775 F.3d at 1099–1100.

For a court to depart from the ordinary remand rule, and award benefits under the "credit as true" rule, three requirements must be met. *Garrison*, 759 F.3d at 1019–21. First, the court must determine that the ALJ committed legal error, such as by failing to provide legally sufficient reasons for rejecting evidence. *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015). Second, if the court finds such error, it must determine whether "the record has been fully developed and further administrative proceedings would serve no useful purpose." *Garrison*, 759 F.3d at 1020. In making this determination, the court reviews the record as whole and asks whether there are conflicts, ambiguities, or gaps in the record such that essential factual issues have not been resolved. *Dominguez*, 808 F.3d at 407 (citation omitted). Where there are outstanding issues that require resolution, the proper approach is to remand the case to the agency for further proceedings. *Treichler*, 775 F.3d at 1101, 1105.

If the court determines that the record has been fully developed and there are no outstanding issues left to be resolved, the court must next consider whether "the ALJ would be required to find the claimant disabled on remand" if the "improperly discredited evidence were credited as true." *Dominguez*, 808 F.3d at 407 (quoting *Garrison*, 759 F.3d at 1020). "If so, the district court may exercise its discretion to remand the case for an award of benefits." *Id*. However, even when the requirements of the credit as true rule are satisfied, district courts retain flexibility to remand for further proceedings when the record as a whole creates "serious doubt" as to whether

– 32 –

the claimant is, in fact, disabled. *Id.* at 1021. "The touchstone for an award of benefits is the existence of a disability, not the agency's legal error." *Brown–Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015).

In this case, having considered the record as a whole, the Court finds there are essential factual issues that have not been resolved. First, there are uncertainties and ambiguities regarding Dr. Kotha's fibromyalgia diagnosis, which raises crucial questions regarding the extent of Marshall's physical limitations. Second, the ALJ did not properly weigh Dr. Chapman's opinion, and it is unclear how this failure affected the disability determination.

Kotha indicated that she diagnosed Marshall with fibromyalgia under the ACR's 1990 Criteria and 2010 Criteria. (AR 450.) A diagnosis under the 1990 Criteria requires a patient to have a "history of widespread pain" and pain in at least 11 of 18 tender points upon physical examination or digital palpation. SSR 12-2p, 2012 WL 3104869, at *3. Kotha indicated on the fibromyalgia questionnaire that Marshall had at least 11 positive tender points. (AR 450.) But in response to the follow-on prompt to "indicate the locations of your patient's tender points," Kotha listed only 10 tender points that are actually legible.[15] The eleventh tender point listed is undecipherable, and a close reading of the record sheds no light on what the additional tender point might be.[16] Thus, it is not entirely clear whether Kotha has identified the minimum 11 positive tender points required to support a fibromyalgia diagnosis under the 1990 Criteria.

There are also uncertainties regarding Kotha's fibromyalgia diagnosis under

---

[15] Kotha also lists "diffuse" as one of the tender point sites supporting her fibromyalgia diagnosis, but "diffuse" is not one of the 18 tender point sites listed in the 1990 Criteria. *See* footnote 11.

[16] After carefully reviewing the record to determine possibilities for the eleventh tender point, the Court found only that Kotha noted "thighs" as a tender point in her March 3, 2014, and March 31, 2014 treatment notes. (AR 495, 499.) However, "thighs" is not one of the 18 tender point sites listed in the 1990 Criteria. While the other ten tender points Kotha lists were recorded explicitly as clinical observations, the Court cannot discern from Kotha's treatment notes the name of the eleventh.

– 33 –

the 2010 Criteria. A diagnosis under the 2010 Criteria requires a patient to have a "history of widespread pain" and "repeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions," such as fatigue, cognitive or memory problems, and waking unrefreshed. SSR 12-2p, 2012 WL 3104869, at *3. Kotha indicated on the fibromyalgia questionnaire that Marshall had nine of these symptoms. (AR 450) However, four of the identified symptoms—"muscle weakness," "chest pain," "difficulty thinking," and "poor memory"—are either not supported by, or are contradicted by, Kotha's treatment notes. For example, there is no indication in the record that Marshall was experiencing muscle weakness; on multiple occasions, Kotha reported that Marshall had full strength in her upper and lower extremities. (AR 488, 491.) Similarly, at no point during the eight treatment sessions that preceded Kotha's completion of the fibromyalgia questionnaire did she report that Marshall experienced "chest pain." In fact, without exception, Kotha noted that Marshall denied chest pain. Finally, the Court has been unable to find a single entry in Kotha's clinical notes stating or suggesting that Marshall had "difficulty thinking" or "poor memory." Indeed, Dr. Filizetti, who as Marshall's treating psychologist would be the treating source to note such symptoms, notably did not cite "difficulty thinking or concentrating" or "poor memory" as a sign or symptom that supported her chronic depression diagnosis. (AR 389.) In light of these ambiguities and conflicts, there are important, unresolved issues regarding Kotha's fibromyalgia diagnosis under the 2010 Criteria.

Finally, there are uncertainties and gaps in the record concerning the proper weight to ascribe to Dr. Chapman's opinion. Although the ALJ was justified in suggesting that Chapman's opinion should not be given controlling weight, the ALJ did not provide legally sufficient reasons to reject the opinion entirely. Instead, the ALJ was required to consider and weigh the factors outlined in 20 C.F.R. §§ 404.1527(c)(2)-(6), and on that basis determine what weight to give Chapman's opinion. Here, the ALJ did not do so, and it is unclear how this failure affected the

– 34 –

ultimate disability determination. Under these circumstances, remand for further proceedings is appropriate. *See, e.g.*, *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1235 (9th Cir. 2011) ("Remand for further proceedings is appropriate where there are outstanding issues that must be resolved before a disability determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated.").

In sum, the Court finds there are uncertainties, ambiguities, and gaps in the record that raise important questions regarding the basis of Kotha's fibromyalgia diagnosis and the proper weight to ascribe to Chapman's opinion. These are essential factual issues that must be resolved before an accurate disability determination can be made. Thus, the ordinary remand rule applies, and the Court remands this case to the ALJ for further proceedings.

## CONCLUSION

For the foregoing reasons, the Court finds that the ALJ did not provide legally sufficient reasons to reject the opinions of Drs. Filizetti, Kotha, and Chapman, and to discredit Marshall's testimony. The Court also finds there are uncertainties, ambiguities, and gaps in the record such that not all essential factual issues have been resolved. Thus, the Court **REVERSES** the Commissioner's decision and **REMANDS** the case for further administrative proceedings consistent with this opinion. Plaintiff's Motion for Summary Judgment is **GRANTED IN PART** (ECF No.13) and the Commissioner's Cross-Motion for Summary Judgment is **DENIED** (ECF No. 22). The Court declines to adopt the Report and Recommendation.[17] (ECF

---

[17] In a Report and Recommendation dated February 23, 2017, the magistrate judge recommended remanding the case on the grounds that the ALJ ignored an MRI scan of Marshall's brain that showed a partially empty sella. (ECF No. 26.) Symptoms of an empty sella may include headaches. The magistrate judge reasoned that evidence of Marshall's partial empty sella should have been taken into account as an objective marker of her migraines and pain symptoms, and that remand was necessary for development of the record on this point.

The Court finds that evidence of a partially empty sella is not a proper basis for remand. Even

– 35 –

No. 26.)

On remand, the ALJ must further develop the record in the following ways. First, the ALJ should determine whether Dr. Kotha's fibromyalgia diagnosis is supported by the 1990 Criteria or 2010 Criteria. If necessary, the ALJ should subpoena Kotha or submit further questions to her to clarify the ambiguities noted herein. *See Smolen*, 80 F.3d at 1288. If the ALJ determines that Kotha's fibromyalgia diagnosis is well-supported by appropriate criteria, the ALJ must give her opinion controlling weight.

Second, the ALJ must determine the proper weight to give Dr. Chapman's opinion given that it is based, in part, on a fibromyalgia diagnosis that he did not support with appropriate diagnostic criteria. In determining how much weight to give Chapman's opinion, the ALJ must explicitly consider the factors outlined in 20 C.F.R. §§ 404.1527(c)(2)-(6) and note which factors, if any, undermine the weight due Chapman's opinion.

Third, the ALJ may not discredit Marshall's pain testimony unless he puts forth specific, clear and convincing reasons for doing so. The reasons discussed herein are legally insufficient. The ALJ is only permitted to reconsider Marshall's testimony to the extent that resolution of the unresolved factual issues noted above—i.e., the basis of Kotha's fibromyalgia diagnosis and the weight to ascribe Chapman's opinion— calls into question her credibility. If that is not the case, the ALJ must credit

---

without considering the MRI scan, the ALJ explicitly found that Marshall had produced evidence of medically determinable migraines and that the migraines were a severe impairment that could be expected to produce some degree of symptoms. Having the ALJ credit evidence of a partially empty sella on remand would not add to this determination. The key issue in dispute is the *severity* of Marshall's migraines, and neither Marshall, the Commissioner, nor the magistrate judge argue that the severity of migraines is measurable by evidence of a partially empty sella. The Court finds no reason to obligate the ALJ to consider evidence not relevant to the ultimate disability determination. *See Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (citation omitted) (explaining that although the ALJ must develop the record, "the ALJ is not required to discuss evidence that is neither significant nor probative"). Accordingly, the Court declines to adopt the Report and Recommendation.

16cv666

Marshall's pain testimony.

Fourth, the ALJ must give Dr. Filizetti's opinion controlling weight and determine whether the dysthymic disorder (i.e., chronic depression) she diagnosed constitutes a severe medically determinable impairment for purposes of step two of the five-step evaluation process. Based on this reassessment, the ALJ must then revisit his step three finding that Marshall's impairments, alone and in combination, did not meet or medically equal the severity of one of the impairments listed in the Act's implementing regulations.[18]

Finally, after further development of the record as outlined above, the ALJ should then reassess Marshall's RFC, pose an updated hypothetical to the vocational expert, and determine whether Marshall is disabled under the meaning of the Social Security Act.

**IT IS SO ORDERED**.

**DATED:  May 12, 2017**

**Hon. Cynthia Bashant**
**United States District Judge**

---

[18] The relevant impairments are listed at 20 C.F.R. part 404, subpart P, appendix 1.